## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|                                              |     |                      |
| -------------------------------------------- | --- | -------------------- |
|                                              | :   |                      |
| MERCANTILE-SAFE DEPOSIT AND                  | :   |                      |
| TRUST COMPANY                                | :   |                      |
|                                              | :   |                      |
| v.                                           | :   | Civil No. CCB-05-2217 |
|                                              | :   |                      |
| CHICAGO TITLE INSURANCE                      | :   |                      |
| COMPANY                                      | :   |                      |
|                                              | :   |                      |

### MEMORANDUM

Now pending before the court are cross motions for summary judgment.[1]  The parties have fully briefed the motions and no hearing is necessary.  *See* Local Rule 105.6.  For the reasons stated below, summary judgment will be granted for the plaintiff.

### BACKGROUND

This suit concerns the alleged breach of two insurance policies (the "Policies") issued by defendant Chicago Title Insurance Company ("Chicago Title") to plaintiff Mercantile-Safe Deposit and Trust Company ("Mercantile").  The Policies at issue insured the title on real property located at 1 Edward Kila Court (the "Property") under two indemnity deeds of trust ("IDOTs") executed by Edward Kila as trustee.  Edward Kila's parents, John and Johanna Kila, the original owners of the Property, transferred the Property to him as trustee under two unrecorded qualified personal residence trusts ("QPRTs") established in their name.  Thereafter, Edward Kila provided the IDOTs and unconditional guaranty agreements as collateral for

---

[1]      Both parties also have submitted motions to compel discovery, which will be denied, as the information sought is not relevant, is privileged, or is not needed to resolve the motions for summary judgment.

1

commercial loans extended by Mercantile to two Kila family businesses, Commart, LLC ("Commart") and McShane, Inc. ("McShane").

More specifically, Mercantile approved a loan to Commart for $1.5 million in March 1999. As an inducement for this loan, John and Johanna Kila signed an unconditional guaranty agreement secured by an IDOT on the Kila Property. (Def.'s Summ. J. Mot., Ex. 21, 22.) John and Johanna Kila were originally named as the grantors on the Commart IDOT because they had previously listed the Kila Property as a personal asset on financial statements submitted to Mercantile, with whom the family had been doing business since 1993. (*See id.*, Ex. 5.) On May 15, 1998, however, John and Johanna Kila had transferred ownership of the Property via a deed of gift to their son, Edward Kila, as trustee under newly established qualified personal residence trusts ("QPRTs"), which were never recorded. (*Id.*, Ex. 6, 7, 9.) The QPRT beneficiaries included (1) John and Johanna Kila, who were entitled to reside at the Kila property for five years;[2] (2) Edward Kila; and (3) John and Johanna's grandchildren (the "residual beneficiaries").

Upon receiving the signed loan documents, Mercantile's lawyer, J. Michael Brennan ("Brennan"), requested title insurance on the Kila Property from Chicago Title.[3] In response, Catherine Jenkins ("Jenkins"), Chicago Title's underwriter, sent Brennan a title commitment

---

[2] Although the trust documents immediately vested ownership in Edward Kila, as sole trustee of the QPRTs, John and Johanna Kila apparently were under the impression that they would retain ownership of the Property while they continued to live there, which partly accounts for the confusion surrounding the Commart IDOT.

[3] Because John Kila had an existing owner's title policy on the Property with Chicago Title, (*see* Pl.'s Summ. J. Mot., Ex. K), Brennan ordered Mercantile's title policy from Chicago Title to take advantage of a re-issue rate discount.

("Commart Title Commitment"), accompanied by the recorded deed of gift, which reflected that

title to the Property was now vested in Edward Kila, as trustee under the QPRTs.[4]  Prior to

receiving the Commart Title Commitment, Mercantile had no knowledge that

John and Johanna Kila no longer owned the Property.

According to its terms, the deed of gift gave Edward Kila, as trustee, extraordinarily

broad powers, including the power "to convey the Property by deed or other conveyance to any

grantee, with or without consideration; to mortgage, execute a deed of trust on, pledge or

otherwise encumber the Property or any part thereof . . . ."  (Def.'s Summ. J. Mot., Ex. 9.)  In

addition, the deed states:

> No party dealing with the Trustees in relation to the Property in any manner
> whatsoever, and . . . no party whom the Property or any part thereof or any
> interest therein shall be conveyed, contracted to be sold, leased or mortgaged by
> the Trustees, shall be obliged; . . . (b) to see that the terms of the trust have been
> complied with; (c) to inquire into the authority, necessity or expediency of any act
> of Trustees; or (d) be privileged to inquire into any of the terms of the Trust
> Agreement creating said Trust.

> Every deed, mortgage, lease or other instrument executed by the Trustees in favor
> of every person claiming any right, title or interest thereunder shall be deemed to
> represent that: (a) that at the time of the delivery thereof the said trust was in full
> force and effect; (b) that such instrument was executed in accordance with the
> trust, terms and conditions thereof and of the said Trust Agreement and in [*sic*]
> binding upon all beneficiaries thereunder; (c) that the Trustees were duly
> authorized and empowered to execute and deliver every such instrument . . . .

(*Id*.)

The Commart Title Commitment required that a deed of trust from Edward Kila, as sole

trustee under the QPRTs, be "executed, delivered and duly filed for record."  (*Id*., Ex. 33.)  In

---

[4]     On March 30, 1999, prior to requesting title insurance on the Property, Mercantile
closed on the Commart loan, advancing $500,000 to Commart based on the IDOT and guaranties
executed by John and Johanna Kila. (Def.'s Summ. J. Mot., Ex. 27, 29.)

addition, Chicago Title conditioned the Commart Policy on receipt of the trust instruments for review.  (*Id*.)  Upon receiving the Commart Title Commitment and deed of gift, Mercantile instructed Brennan to revise the Commart Guaranty and IDOT to reflect the correct title holder. Relying on the broad language of the deed of gift, Brennan prepared an unconditional guaranty and IDOT for Edward Kila to sign on behalf of the QPRTs as trustee.

Mercantile then forwarded the revised documents to Chicago Title.[5]  Also relying on the deed of gift, Chicago Title proceeded to issue the title policy and record the IDOT in the land records of Queen Anne's County, waiving (as more fully discussed below) any requirement that the trust instruments be reviewed by Chicago Title.[6]  (Pl.'s Summ. J. Mot., Jenkins Dep., Ex. O at 95, 100-03.)  It is undisputed that neither Mercantile nor Chicago Title had reviewed the unrecorded trust documents at the time title insurance was issued by Chicago Title.

Shortly thereafter, Mercantile essentially duplicated the above process with respect to a revolving line of credit increase for McShane and a $1.75 million dollar lien on the Kila Property.  Brennan similarly secured title insurance from Chicago Title for the McShane IDOT, which was granted by Edward Kila, as sole trustee of the QPRTs.

By October 2001, the business fortunes of Commart and McShane had deteriorated

---

[5]     Brennan never forwarded the unconditional guaranties and IDOT signed by John and Johanna Kila, explaining that once Mercantile realized Edward Kila owned the Property, there was no need to send these original documents to the title company. (Def.'s Summ. J. Mot., Brennan Dep., Ex. 15 at 177-78.)

[6]     Due to delays in the forwarding of funds to cover the costs of title insurance from Mercantile to Chicago Title, the Commart IDOT was not recorded and Chicago Title did not issue title insurance until July 22, 1999, almost two months after Chicago Title had first sent Mercantile the Commart Title Commitment.  By this time, Mercantile had advanced nearly all the funds under Commart's $500,000 term loan and $1 million revolving line of credit increase. (Def.'s Summ. J. Mot., Ex. 23, 27.)

significantly.  (Def.'s Summ. J. Mot., Barclay Dep., Ex. 1 at 162-63.)  As a result, in November

2001, the Kilas entered into a formal agreement with Mercantile requiring, among other things,

liquidation of the Kila Property.  Over a year later, an attorney representing John and Johanna

Kila's grandchildren, the QPRT residual beneficiaries, notified Mercantile that his clients were

disputing the company's right to foreclose on the Property under the IDOTs.  The grandchildren

filed suit in Circuit Court for Baltimore County on April 22, 2002, claiming that Edward Kila

engaged in improper self-dealing when he encumbered the trust property.

       Pursuant to a notice of claim from Mercantile, Chicago Title retained attorney Thomas

McDonough ("McDonough") to defend Mercantile in the above action.  Because Chicago Title

waived its right to review the trust documents without writing an exclusion into the title

insurance contract, Sharon Burke ("Burke"), Chicago Title's claims counsel assigned to

investigate Mercantile's claim, concluded that Chicago Title was obligated to indemnify

Mercantile in the event the residual beneficiaries succeeded in invalidating the IDOTs.  (Pl.'s

Summ. J. Mot., Burke Dep., Ex. U at 75-76.)  Thus, Chicago Title assumed Mercantile's defense

without disclaiming liability or making any reservations of right, aside from one unrelated to the

title insurance at issue in this case.  (Def.'s Summ. J. Mot., Ex. 63.)

       Ultimately, the Circuit Court of Queen Anne's County ordered the IDOTs null and void

pursuant to the Maryland Court of Special Appeals decision in *Mercantile Safe Deposit & Trust*

*Co. v. Finn*, in which the court held that Edward Kila had no power to encumber the Property in

order to secure "a loan completely unconnected with the trust," as doing so "was 'inconsistent

with the beneficiaries' right to the beneficial enjoyment' of the corpus of the trust property."

(Pl.'s Summ. J. Mot., Ex. X at 12; Def.'s Summ. J. Mot., Ex. 67.)  McDonough appealed the

*Finn* decision to the Maryland Court of Appeals, which denied certiorari. *Mercantile v. Finn*, 869 A.2d 865 (Md. 2005). Consequently, Mercantile was unable to foreclose on the IDOTs.

Once the *Finn* litigation was fully and finally resolved, Brennan sent Chicago Title, at its request, a "proof of claim" letter dated May 9, 2005. The letter outlined the amount of the outstanding balances owed under the Commart and McShane loans, which well exceeded the $3.25 million insurance coverage provided for under the Policies. (Def.'s Summ. J. Mot., Ex. 68.) Thereafter, Chicago Title's newly obtained outside counsel, James Bruce Davis ("Davis"), informed Brennan that Chicago Title would need to investigate the claim prior to making a decision on payment and requested access to Mercantile's files to determine whether a covered loss had occurred. (*Id*., Ex. 70.) Mercantile's new lawyer, Kevin Pascale ("Pascale"), advised Chicago Title on June 9, 2005 that Mercantile would "cooperate fully" with its request, but needed "a clearer understanding" of what Chicago Title was looking for. (*Id*., Ex. 71.) Mercantile then filed suit on July 14, 2005.

Three years after assuming Mercantile's defense in the underlying *Finn* litigation, Chicago Title now asserts that several provisions of its Policies bar Mercantile's coverage claims. Hence, Chicago Title has refused to reimburse Mercantile for its losses. Mercantile, in turn, brought this action against Chicago Title for breach of contract and declaratory relief.

## ANALYSIS

### I. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to a judgment as a matter of law." The

Supreme Court has clarified this does not mean that any factual dispute will defeat the motion:

"By its very terms, this standard provides that the mere existence of some alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary

judgment; the requirement is that there be no genuine issue of material fact." *Anderson v.

Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

      "The party opposing a properly supported motion for summary judgment 'may not rest

upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts

showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club,

Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).

The court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all

reasonable inferences in her favor without weighing the evidence or assessing the witness'

credibility," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002),

but the court also must abide by the "affirmative obligation of the trial judge to prevent factually

unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal

quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir.1993), and

citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

## II. Policy Coverage

      In this diversity action, Maryland law applies. *Riesett v. W.B. Doner & Co.*, 293 F.3d

164, 173 n.5 (4th Cir. 2002). In Maryland, insurance policies, like all contracts, are construed as

a whole according to the parties' intentions. *Standard Fire Ins. Co. v. Proctor*, 286 F. Supp. 2d

567, 574 (D. Md. 2003). Words are given their "customary, ordinary and accepted meaning"

unless there is some indication that the parties intended otherwise. *Bushey v. N. Assurance Co. of Am.*, 766 A.2d 598, 600-01 (Md. 2001) (internal quotation omitted). Maryland has not adopted the rule followed in many jurisdictions that an insurance policy is "construed most strongly against the insurer." *Id.* at 601. Only if a term is ambiguous in light of all the evidence will the ambiguity be construed against the insurer as the drafter of the contract. *Proctor*, 286 F. Supp. 2d at 574.

Title insurance, as an indemnity agreement, reimburses "the insured for loss or damage sustained as a result of title problems, as long as coverage for the damages incurred is not excluded from the policy." *Stewart Title Guar. Co. v. West*, 676 A.2d 953, 960 (Md. Ct. Spec. App. 1996). The insured bears the initial burden of proving that the claim is covered by the policy. *See In re The Wallace & Gale Co.*, 275 B.R. 223, 230 (D. Md. 2002); *see also* 17A Couch on Ins. 3d §§ 254:12 (2006). The burden then shifts to the insurer to prove an exclusion applies. *Id.*

The title insurance policies issued by Chicago Title on the Commart and McShane IDOTs follow the standard form developed by the American Land Title Association, insuring Mercantile against loss or damage due to, *inter alia*, "[a]ny defect in or lien or encumbrance on the title" or "[t]he invalidity or unenforceablity of the lien of the insured mortgage upon the title." (Def.'s Summ. J. Mot., Supplemental Ex. 42.) There is no dispute that the title risk in the present case falls within these quoted coverage terms. Chicago Title could have excluded from coverage title risks arising from the unreviewed trust documents, but chose not to. Chicago Title asserts, however, that the "IDOTs unenforceability caused no loss or damage compensable under the Policies because the IDOTs did not secure valid debt obligations." (Def.'s Summ. J. Mot.

8

28.)

More specifically, Chicago Title argues that the unconditional guaranties signed by Edward Kila as trustee on behalf of the QPRTs are invalid for the same reasons the Maryland Court of Special Appeals found the IDOTs invalid in *Finn*. Thus, according to Chicago Title, because the IDOTs secured the unconditional guaranties and not the underlying loan obligations of Commart and McShane, the IDOTs did not secure valid debt obligations. Explaining that title insurance does not insure against problems arising from the validity of the underlying debt obligation, Chicago Title relies on a Utah Supreme Court Case, *Pacific Am. Constr. v. Sec. Union Title*, 987 P.2d 45, 47-48 (Utah 1999), to contend that Mercantile's claim does not fall within the Policies' coverage terms.[7]

---

[7]     *Pacific*, and its companion case *Luddington v. Bodenvest Ltd.*, 855 P.2d 204, 205-06 (Utah 1993), involved an insured lender, Pacific American Construction ("Pacific"), which sought to foreclose on a deed of trust pledging land owned by a limited partnership, Bodenvest, Ltd. ("Bodenvest"), as collateral for a personal loan to Bodenvest's corporate general partner, Grenada, Inc. ("Grenada"). The Supreme Court of Utah interpreted its opinion in *Luddington* as holding the trust deed unenforceable against Bodenvest for lack of consideration. *Pacific*, 987 P.2d at 47. Because the trust deed was not held invalid *per se*, however, the Utah Supreme Court reasoned that Pacific's losses resulted from the deficiency of the loan obligation underlying the mortgage lien rather than the trust deed or title itself. *Id.* Thus, these losses were not covered by Pacific's title insurance policy. *Id.*

Pacific is not binding on this court and is factually distinguishable. For example, the *Pacific* holding relied on the trial court's findings that the lender failed to provide the title company with a copy of the hypothecation statement and promissory note, which would have revealed the unenforceability of the underlying debt. *Id.* Because the title company did not, and would not normally, have access to these documents, the Utah Supreme Court concluded it would be unreasonable to assign liability to the title company. *Id.* at 47-48.

By contrast, Chicago Title and Mercantile shared a parity of knowledge regarding Edward Kila's power to encumber the trust property. In addition, unlike in *Luddington*, where neither the trust deed nor the hypothecation statement expressly referenced the underlying promissory note, the Commart and McShane IDOTs refer to the companies' underlying loan obligations, noting the name of the borrower and the loan amount being secured. *See Luddington*, 855 P.2d at 206. Thus, Chicago Title had notice of the possible title risk at issue in this case and in the regular course of business could have required review of the trust documents

The Commart and McShane IDOTs: (1) expressly reference the amount of debt assumed by each company pursuant to various promissory notes; (2) cite Edward Kila's unconditional guaranty agreements, which are signed on behalf of the QPRTs as trustee and guarantee the repayment of the promissory notes; and (3) grant a lien on 1 Edward Kila Court to secure the payment of "any and all amounts coming due under the Guaranty." (Def.'s Summ. J. Mot., Ex. 36, 53.) The plain language of the IDOTs makes clear that although the IDOTs served as collateral for the unconditional guaranty agreements, they also indirectly secured the underlying loan obligations of Commart and McShane, as evidenced by the reference to the promissory notes in the IDOTs. (*See id.*, Barclay Dep., Ex. 1 at 125-26.) The reason for this distinction is based in Maryland practice, whereby when real property is pledged as collateral by a third party guaranteeing payment of an underlying loan, an unconditional guaranty is typically executed along with an IDOT in order to avoid incurring recordation taxes. (*See, e.g.*, 74 Md. Op. Atty. Gen. 281 (1989); Pl.'s Opp'n, Schleupner Dep., Ex. C at 36-38.)

This formality, however, does not change the nature of an IDOT as a security device. The Maryland Court of Special Appeals has explained:

> [U]nder an indemnity deed of trust, some third party has agreed to act as the guarantor of the borrower by placing its property in trust . . . [U]pon an event of default in the underlying obligation, the entire loss may be shifted to the third party. . . . [I]f the loan is not repaid, it is through the indemnity deed of trust that the beneficiary has recourse – e.g., by selling the third party's property and applying the funds received against the borrower's indebtedness.

*Springhill Lake Investors Ltd. P'ship v. Prince George's County*, 690 A.2d 535, 539 (Md. Ct.

---

or excluded the title risk from coverage. In the present case, however, the defendant chose to do neither. It is therefore not unreasonable to expect Chicago Title to assume payment of Mercantile's claims.

Spec. App. 1996). The Commart and McShane Policies insured that Mercantile would be able to rely on the IDOT in this manner, recouping Mercantile's losses to the extent of the liens on the Kila Property in the event of default by either company. (*See* Pl.'s Opp'n, Schleupner Dep., Ex. C at 34-36 (affirming that the Policies insured "the lien of the IDOT can be foreclosed"); Def.'s Summ. J. Mot., Barclay Dep., Ex. 1 at 125 (Robert Barclay, Mercantile's Senior Vice President, explaining that he was "relying upon Chicago Title to give [him] confidence that [Mercantile] had a proper lien on the property to support those loans").)

Interpreting the language of the IDOT as though it secured only the unconditional guaranty agreements and not the underlying promissory notes would be to rely on a technical differentiation that ignores Maryland practice and, more importantly, contradicts the plain purpose of the IDOTs as well as the parties' understanding of the title insurance contracts. Moreover, under Chicago Title's policies, lien instruments that incorporate the debt obligation, such as an indemnity mortgage, and those that rely on a separate debt obligation, such as an IDOT, all fall under the general policy definition of "mortgage," which includes "deeds of trust, trust deeds and other security instruments." (Pl.'s Summ. J. Mot., Ex. P, Condition & Stipulation 1(e).)

Thus, the Commart and McShane IDOTs secured the companies' underlying loan obligations as evidenced by the promissory notes described in the IDOTs. Chicago Title insured Mercantile's right to foreclose under these IDOTs. As a result of the IDOTs' invalidity, Mercantile was unable to foreclose on the Kila property. Consequently, Mercantile has suffered a loss covered under the Policies.

### III.  Equitable Estoppel

Even if Mercantile had not suffered a loss within the four corners of the Policies, Chicago Title would be estopped from denying coverage of Mercantile's claims on any basis involving the underlying litigation of the IDOTs' validity in *Finn*.[8]  The doctrine of estoppel "refers to an abatement raised by law of rights and privileges of the insurer when it would be inequitable to permit their assertion."  *Nationwide Mut. Ins. Co. v. Reg'l Elec. Contractors, Inc.*, 680 A.2d 547, 553 (Md. Ct. Spec. App. 1996).  "A party asserting the benefit of an estoppel 'must have been misled to his injury and have changed his position for the worse, having believed and relied on the representations of the party sought to be estopped."  *See Creveling v. Gov't Employees Ins. Co.*, 828 A.2d 229, 246 (Md. 2003).  Consequently, to estop Chicago Title from asserting lack of coverage as a defense, Mercantile must prove three basic elements: (1) conduct or misrepresentation; (2) reliance; and (3) prejudice.  *See id.* at 247; *Chawla v. Transamerica Occidental Life Ins. Co.*, 440 F.3d 639, 646 (4th Cir. 2006); *Hartford Fire Ins. Co. v. Annapolis Bay Charters, Inc.*, 69 F. Supp. 2d 756, 763 (D. Md. 1999).

In the majority of jurisdictions, including Maryland, the doctrine of estoppel cannot be used in the insurance context to extend coverage to risks not covered by the policy terms or expressly excluded therefrom.  *Annapolis Bay Charters*, 69 F. Supp. 2d at 763.  A rare exception to this rule, however, is that once an insurance company assumes the defense of an action with actual or presumed knowledge of facts that would have permitted it to deny coverage, the insurer

---

[8]    Mercantile asserts Chicago Title is estopped entirely from denying coverage, but has not presented sufficient evidence to allow summary judgment on this basis with respect to Chicago Title's other claims.  Mercantile has not shown that Chicago Title had sufficient information on which to base its other affirmative defenses at the time it assumed Mercantile's defense in *Finn*, nor is there any allegation of prejudice specific to those claims.

will be estopped from later raising non-coverage as an affirmative defense.[9]  *See id*.; *see also*

*Rowe v. U.S. Fid. & Guar. Co.*, 375 F.2d 215, 221 (4th Cir. 1967).  A party asserting this

exception, however, retains the burden of proving prejudice, the third prong of estoppel.

In the present case, Chicago Title had all the information at its disposal material to the

question of the IDOTs' validity when it assumed Mercantile's defense in *Finn*, facts Chicago

Title now asserts support a defense to Mercantile's coverage claim.[10]  On March 26, 2002,

Brennan forwarded to Mary Lou Ryce ("Ryce"), Chicago Title's underwriting counsel, copies of

the title insurance policies, deed of gift, and a letter from the grandchildren's attorney

questioning the validity of the IDOTs.  (Pl.'s Summ. J. Mot., Ex. T.)  Mercantile's claim was

then referred to Burke, Chicago Title's claims counsel, who reviewed these documents as well as

the IDOT trust instruments obtained from the grandchildren's attorney.  Burke concluded

without reservation that Chicago Title was obligated to assume Mercantile's defense and

indemnify the company in the event the IDOTs were held invalid.  (Pl.'s Summ. J. Mot., Burke

Dep., Ex. U at 75-76; Def.'s Summ. J. Mot., Ex. 63.)

---

[9]    Although the Maryland Court of Appeals has not yet had occasion to adopt this exception, *see Creveling*, 828 A.2d at 247 n.11, the Maryland Court of Special Appeals and this District Court have applied it on a case-by-case basis. *See Nationwide*, 680 A.2d at 553; *Annapolis Bay Charters*, 69 F. Supp. 2d at 763-64.

[10]    Although Chicago Title argues it did not know the critical fact that Edward Kila had a personal interest in Commart and McShane not shared by the QPRT residual beneficiaries, the record shows that McDonough kept Chicago Title apprised of all developments in the case throughout the litigation.  (*See* Pl.'s Rep., Ex. F, G, H.)  Thus, if Chicago Title did not know this fact at the moment it assumed Mercantile's defense, it received such knowledge shortly thereafter without changing its position.  Moreover, whether the residual beneficiaries shared a personal interest in the Kila family businesses remains unresolved, as the Court of Special Appeals refused to address it in *Finn* because it had not been raised below.  (Pl.'s Summ. J. Mot., Ex. X at 9 n.2.)

For three years, Chicago Title, through its retained counsel, McDonough, defended

Mercantile's right to foreclose on the IDOTs, appealing the case to the Maryland Court of

Appeals, which denied certiorari.  During this time, Mercantile relied on McDonough's legal

expertise and Chicago Title's assurance that Mercantile would be indemnified in the event the

IDOTs were held unenforceable.  Thus, the above exception will apply if Mercantile can show

prejudice flowing from this reliance.

Mercantile characterizes Chicago Title's about-face in the present case as analogous to,

or creating, a conflict of interest.  Under Maryland law, when a conflict of interest materializes

over coverage issues between an insured and insurer, "the insured must be informed of the nature

of the conflict and given the right either to accept an independent attorney selected by the insurer

or to select an attorney himself to conduct his defense."  *See Brohawn v. Trans-America Ins. Co.*,

347 A.2d 842, 854 (1975).  The Maryland Court of Appeals has explained:

> Under the terms of most liability insurance policies, the insured agrees to permit
> the insurer to choose counsel to defend the insured against claims by third parties.
> . . . [T]his customary clause in insurance policies . . . is consent in advance by the
> insured to such dual representation and obviates an improper relationship.
> However, if an actual conflict develops during the course of the representation,
> the attorney may not continue to represent both parties.
>
> Generally, the insurer and insured have compatible interests and goals in
> responding to a tort claim.  However, their interests may diverge at times, creating
> a potential or actual conflict of interest.  We have recognized that the potential for
> a conflict of interest exists under liability insurance policies because of the
> insurer's exclusive control over the investigation, defense and settlement of a
> claim.

*Allstate Ins. Co. v. Campbell*, 639 A.2d 652, 658-59 (Md. 1994) (internal quotation marks and

citations omitted).

Mercantile asserts that by failing to disclose this conflict of interest, Chicago Title denied

Mercantile the opportunity to select its own disinterested counsel, pursue an alternative resolution that would prevent Chicago Title from denying coverage, or seek other sources of recovery prior to the statute of limitations expiring.  Specifically, Mercantile presents evidence that Edward Kila approached the company to negotiate a settlement of $1 million, which Mercantile rejected on the belief that Chicago Title would fulfill its indemnity obligations.  (*See* Pl.'s Rep., Kila Dep., Ex. E at 74-75.)  At subsequent times thereafter, the Kilas' lawyers made other entreaties to Mercantile to settle the case, at which point McDonough made clear to Brennan that Chicago Title would need to be involved in any future mediation as Chicago Title would be responsible for any outstanding coverage amount not paid by Edward Kila.  (*See id*., Ex. F & Ex. D, McDonough Dep. at 106-07.)  Three years later, Mercantile no longer has these settlement options.

In addition, Mercantile cites two legal arguments that were never raised by McDonough in the underlying *Finn* litigation.  Whether these arguments would have been successful is speculative.  At this late stage in the proceedings, however, it would be extremely difficult for Mercantile to determine in hindsight, much less prove, that it was prejudiced by a conflict of interest not revealed until all litigation was fully and finally resolved.  While Mercantile has not presented any evidence indicating when, if at all, during the litigation, Chicago Title intended to rely on the *Finn* decision to deny coverage of plaintiff's claims, Mercantile has shown that it relied on McDonough to remain independent and disinterested in pursuing an outcome that did not prejudice Mercantile's right to indemnification in the event Chicago Title did not clear title to the IDOTs.

After assuming Mercantile's defense without reservation and proceeding to litigate away

plaintiff's right to foreclose on the Kila Property, Chicago Title cannot now attempt to avoid

coverage based on the same facts in the underlying *Finn* litigation, for which Chicago Title

appointed counsel and to some extent controlled the proceedings and settlement possibilities.

Thus, this court is persuaded that the present case is the exact situation in which equitable

estoppel should extend to prevent Chicago Title from avoiding coverage.

### IV.  Exclusions

### A.  "Created, Suffered, Assumed"

Even if this court finds, as it does, that Mercantile's claims fall within the Policies'

coverage terms, defendant asserts exclusions in the Policies that allegedly bar plaintiff's

recovery.  Chicago Title first points to Policy Exclusion 3(a), which excludes coverage of title

defects and encumbrances "created, suffered, assumed or agreed to by the insured claimant."

(Def.'s Summ. J. Mot., Supplemental Ex. 42.)  This provision, found in many title insurance

policies, is generally construed to exclude knowing and intentional conduct by the insured that

results in a title defect or encumbrance.  *See, e.g.*, *Am. Sav. & Loan Ass'n v. Lawyers Title Ins.

Corp.*, 793 F.2d 780, 784 (6th Cir. 1986); *Brown v. St. Paul Title Ins. Corp.*, 634 F.2d 1103,

1107 n.8 (8th Cir. 1980); *Ticor Title Ins. Co. v. FFCA/IIP 1988 Prop. Co.*, 898 F. Supp. 633, 640

(N.D. Ind. 1995); *Stevens v. United Gen. Title Ins. Co.*, 801 A.2d 61, 69 (D.C. 2002).  The

insurer, however, may not avoid liability based on mere negligence of the insured in bringing

about the loss.  *See, e.g.*, *Lawyers Title Ins. Corp.*, 793 F.2d at 784; *Brown*, 634 F.2d at 1107 n.8.

In an attempt to fit Mercantile's conduct into this exclusion, Chicago Title argues

Mercantile "prevailed upon a fiduciary, Edward Kila, to breach his trust for Mercantile's

benefit."  (Def.'s Summ. J. Mot. 36.)  Chicago Title has offered no evidence, however, to

support its claim that Mercantile improperly intended for Edward Kila to engage in self-dealing or had actual knowledge thereof.

Upon learning that John and Johanna Kila no longer owned the Kila Property, Mercantile asked Edward Kila to sign an unconditional guaranty and IDOT, on behalf of the QPRTs as trustee, in accordance with the Commart Title Commitment, which required Mercantile to obtain a deed of trust from Edward Kila. (*Id.*, Ex. 33 & Ex. 15, Brennan Dep., at 129-30.) Robert Barclay ("Barclay"), Mercantile's Senior Vice President, testified that he felt confident Mercantile's title to the Kila Property was not defective, given the broad language of the deed of gift as well as the fact that Chicago Title had insured the IDOTs. (*Id.*, Barclay Dep., Ex. 1 at 27, 203.) Indeed, the record shows both Mercantile and Chicago Title were relying on the deed of gift as providing Edward Kila with the authority to encumber the Property. Edward Kila even testified that he thought he had the power to encumber the Property under the trust documents because McShane and Commart were family-owned businesses and as such the loans benefitted the entire family, including the QPRT residual beneficiaries. (Pl.'s Opp'n, Kila Dep., Ex. D at 55, 60.)

Despite the lack of evidence suggesting improper motives or inequitable dealing by Mercantile, Chicago Title argues Mercantile had legal notice that Edward Kila was engaging in self-dealing. *See* Restatement (Second) of Trusts § 297 cmt. m (1959) ("In a transaction known to the transferee to be for the benefit of the transferor personally, the transferee is chargeable with notice that the transfer is in breach of trust."). Mercantile thereby participated in a breach of trust, according to Chicago Title, when it asked Edward Kila to sign the guaranties and IDOTs on behalf of the QPRTs. *See Phillips Way, Inc. v. Presidential Fin. Corp.*, 768 A.2d 94, 99-102

17

(Md. Ct. Spec. App. 2000).  Legal notice, however, is a term of art, the definition of which does

not include the critical element of intent common to the definitions of 3(a)'s exclusionary terms.

*See* Black's Law Dictionary 484 (2d pocket ed. 2001) (defining constructive notice as "notice

arising by presumption of law from the existence of facts and circumstances that a party had a

duty to take notice of").

As a prudent business, Mercantile, like Chicago Title, should have obtained the trust

documents. Nevertheless, mutual mistake or mere negligence is not sufficient to establish a

policy exclusion under the terms of 3(a).  *See Brown*, 634 F.2d at 1107 n.8 ("The cases

discussing the applicability of the "created or suffered" exclusion generally have stated that the

insurer can escape liability only if it is established that the defect, lien or encumbrance resulted

from some intentional misconduct or inequitable dealings by the insured . . . The courts have not

permitted the insurer to avoid liability if the insured was innocent of any conduct causing the

loss or was simply negligent in bringing about the loss.").  Consequently, under the

circumstances of this case, Mercantile's claim is not excluded from coverage by Policy

Exclusion 3(a).

### B.  Concealed Material Facts

Chicago Title next points to Policy Exclusion 3(b), which excludes coverage of matters

"not known to the Company, not recorded in the public records at Date of Policy, but known to

the insured claimant and not disclosed in writing to the Company by the insured claimant prior to

the date the insured claimant became an insured under this policy."[11]  (Def.'s Summ J. Mot.,

---

[11]    Chicago Title also notes Exclusion 3(e), which excludes coverage of defects or
encumbrances "resulting in loss or damage which would not have been sustained if the insured
claimant had paid value for the insured mortgage."  (Def.'s Summ. J. Mot., Supplemental Ex.

Supplemental Ex. 42.)  Explaining that this provision embodies the requirement that the insured

act with utmost good faith in disclosing conditions materially affecting the title risk, Chicago

Title asserts Mercantile breached its duty to act in good faith by misrepresenting or withholding

from Chicago Title facts relevant to the title risk.

Under Maryland law, "[a] material misrepresentation made by an applicant for insurance,

in reliance on which a policy is issued to him, renders the policy voidable . . . whether such

misrepresentation be made intentionally, or through mistake and in good faith." *Government*

*Emp. Ins. Co. v. Cain*, 226 F. Supp. 589, 591-92 (D. Md. 1964).  Thus, for exclusion 3(b) to

apply, Chicago Title must prove that Mercantile: (1) made a false statement of fact or failed to

disclose a fact; (2) that is material to the title risk; and (3) on which Chicago Title relied.  *See id.*;

*see also Hartford Accident and Indem. Co. v. Sherwood Brands, Inc.*, 680 A.2d 554, 561 (Md.

Ct. Spec. App. 1996).  A material misrepresentation is one that "would reasonably influence the

insurer's decision as to whether it should insure the applicant."  *Silberstein v. Massachusetts*, 55

A.2d 334, 338-39 (Md. 1947); *see also Jackson v. Hartford Life & Annuity Ins. Co.*, 201 F.

Supp. 2d 506, 512-13 (D. Md. 2002).  Only material misrepresentations on which an insurer

relies in deciding whether or not to accept the risk will void the policy.  *Sherwood*, 680 A.2d at

561.

Chicago Title first asserts Mercantile misrepresented the structure of the security

transaction.  Both the Commart and McShane IDOTs recite: "as part of the inducement to Note

---

42.)  In reference to this exclusion, Chicago Title argues that Mercantile would not have suffered
a loss if it had paid consideration to the QPRTs for the unconditional guaranties.  This is merely
a restatement of defendant's earlier argument that the IDOTs only secured invalid debt in the
form of the unconditional guaranties.  Because this court holds the IDOTs also secured the
underlying promissory notes, exclusion 3(e) does not apply.

Holder [Mercantile] to make the aforementioned loan to the Borrower [Commart/McShane],

Grantor [Edward Kila as trustee] has agreed to guarantee the repayment of the indebtedness

evidenced by the Note pursuant to an Unconditional Guaranty Agreement of even date

herewith." (Def.'s Summ. J. Mot., Ex. 36, 53.)  Chicago Title alleges, however, that:

> The true state of affairs regarding Mercantile's loans to Commart was that
> Mercantile previously had closed the Commart loan in reliance on a defective
> IDOT signed by John and Johanna Kila, Mercantile had already advanced the vast
> majority of loan funds to Commart, and that Mercantile was restructuring the
> transaction to require a guaranty and IDOT from the Trustee under QPRTs that
> had received no apparent benefit from the loans to Commart.[12]

(*Id*. at 40.)

Yet, in determining the nature and structure of the transaction, Jenkins, Chicago Title's

underwriter, testifies that the company was concerned only with the most basic information

regarding the type of the underlying transaction involved.  (Pl.'s Opp'n, Jenkins Dep., Ex. A at

47-50.)  Thus, in issuing the Commart Title Commitment, Chicago Title only wanted to know

that the transaction was a commercial refinance for $1.5 million and to review the title search

from the abstractor.  (*Id*. at 50-53.)

Even assuming Chicago Title had no knowledge of either the loan advances or the

transfer of ownership of the property, Chicago Title has presented no evidence on the materiality

of these facts to the title risk.  Instead, Jenkins testifies that Chicago Title did not have a policy

against funds being disbursed by the lender prior to issuance of the title policy.  In addition, she

---

[12]     Chicago Title also makes passing reference to financial difficulties experienced
by Commart and McShane at the time, which were not disclosed to Chicago Title.  Title
insurance, however, does not insure that a mortgage debt is likely to be repaid.  *See, e.g.*, *Focus
Inv. Assoc., Inc. v. American Title Ins. Co.*, 992 F.2d 1231, 1237 (1st Cir. 1993).  Thus, the fiscal
situation of Commart and McShane is not material to assessing a title risk.

believes Chicago Title would not have refused to issue the policies if a lender did so.  (*Id*. at 115-16.)  Jenkins's opinion is reasonable, given that whether Mercantile had already advanced funds to Commart is not relevant to any title risk.  Furthermore, despite the funds technically being advanced prior to Edward Kila signing the guaranties, Mercantile clearly was relying on both the unconditional guaranty and IDOT in making the underlying loan.

Likewise, there is no evidence that Chicago Title would have considered material the fact that the QPRTs were brought into the transaction because John and Johanna Kila no longer owned the Property pledged as collateral for the Commart loan.  Rather, Michael Schleupner ("Schleupner"), Chicago Title's state counsel, testifies to the importance of an IDOT grantor's identity, stating that from a title perspective, it does not make any difference whether a transaction involves a third-party guarantor or a "straw man" and mirror note, in which the borrower and grantor are essentially the same.  (*Id*., Schleupner Dep., Ex. C at 24-25.)  In addition, Chicago Title knew that John Kila had previously owned the Property because he had a pre-existing owner's policy on the Kila Property with Safeco, Chicago Title's predecessor.  (*See* Pl.'s Summ. J. Mot., Ex. K.)

The real thrust of Chicago Title's argument regarding the transaction's structure is that if defendant had known the QPRT residual beneficiaries received no benefit from the underlying loans to Commart and McShane, Chicago Title may have declined to issue title insurance.  According to Policy Exclusion 3(b), only material facts known to Mercantile, but not within Chicago Title's purview, can void the policy.  Chicago Title and Mercantile, however, shared a parity of all facts relevant to the title risk at issue in the present case.  Like Mercantile, Chicago Title knew that the IDOTs, executed by Edward Kila as trustee, secured loans extended to

21

McShane and Commart.  Neither Mercantile nor Chicago Title thought that by signing these

loans, Edward Kila was acting in violation of the trust documents, as the Maryland Court of

Special Appeals would later rule.

Defendant next argues that Brennan misrepresented to Chicago Title that the Kilas

objected to producing copies of the trust instruments and in reliance on this misrepresentation,

Chicago Title waived review of the documents.  Yet, only Jenkins remembers having this

conversation with Brennan, and she specifically testified that she did not rely on the conversation

in determining whether Chicago Title should issue title insurance on the IDOTs.  (*Id*., Jenkins

Dep., Ex. O at 102.)  Instead, Jenkins relied on the approval of Mike Schleupner, who, according

to Jenkins's recollection, advised her that Chicago Title would go ahead without the trust

documents based on Brennan's reputation as a good lawyer and in light of the fact that Chicago

Title had the deed of gift in its possession and Mercantile most likely would be reviewing the

trust instruments.[13]  (*Id*. at 95.)  Thus, Chicago Title has failed to present evidence that Jenkins,

Schleupner, or any other Chicago Title employee relied on the substance of Jenkins's

conversation with Brennan in waiving review of the trust instruments.  Based on the evidence in

the record, therefore, Chicago Title has not met its burden of proof with regard to Policy

Exclusion 3(b).

### C.  Breach of Policy Condition

Finally, Chicago Title asserts Mercantile breached its obligation under Policy Condition

and Stipulation 5 ("Policy Condition 5"), which requires Mercantile to furnish a proof of loss

---

[13]    Schleupner does not recall any such conversation with Jenkins, but confirms that he had the authority to waive this requirement.  (*See* Pl.'s Opp'n, Schleupner Dep., Ex. C at 15-16, 18.)

and "produce for examination, inspection and copying . . . all records, books, ledgers, checks, correspondence and memoranda . . . which reasonably pertain to the loss or damage." (Def.'s Summ. J. Mot., Supplemental Ex. 42.) Failure to produce reasonably requested information terminates any liability of the insurer. Mercantile, however, insists Chicago Title waived this provision when it assumed Mercantile's defense for three years without making any such request.

In the insurance context, Maryland distinguishes between "defenses founded upon lack of basic coverage and those arising from the failure of the claimant to satisfy some 'technical' condition subsequent." *See Ins. Co. of N. Am. V. Coffman*, 451 A.2d 952, 957 (Md. Ct. Spec. App. 1982), *see also Creveling*, 828 A.2d at 243-45. Those defenses falling within the latter category, in which Policy Condition 5 is included, can be waived when an insurer engages in conduct "inconsistent with an intention to insist upon a strict performance." *Hartford Fire Ins. Co. v. Keating*, 38 A. 29, 32 (Md. 1897); *see also United Capitol Ins. Co. v. Kapiloff*, 155 F.3d 488, 497 (4th Cir. 1998) ("Under Maryland law, an insurance company may waive a condition of its policy by its conduct when it induces an honest belief that the condition is not required, when the insured is duly misled, and when no extension of coverage results from the waiver."); *Creveling*, 828 A.2d at 244-45 (clauses that can be forfeited by implication "include provisions such as filing a timely notice of claim and submitting proofs of loss").

Mercantile first formally notified Chicago Title of its claim in March 2002. After completing an investigation of the claims in the complaint, Burke, Chicago Title's claims counsel, concluded that Chicago Title had an indemnity obligation to Mercantile in the event the IDOTs were held invalid. (Pl.'s Summ. J. Mot., Burke Dep., Ex. U at 43-45.) In a letter on May

2, 2002, Burke notified Brennan that Chicago Title had retained McDonough to assume

Mercantile's defense in the action.  (Def.'s Summ. J. Mot., Ex. 63.)

Three years later, following resolution of the *Finn* litigation, Mercantile submitted a

"proof of claim," as requested by Chicago Title.  In response, Davis, defendant's newly retained

outside counsel, informed Brennan that Chicago Title was not prepared to pay Mercantile's

claim and requested access to Mercantile's files to determine whether a covered loss had

occurred.  (*Id.*, Ex. 70; Pl.'s Opp'n, Brennan Dep., Ex. B at 260-64.)  Uncomfortable with

providing unfettered access to Mercantile's files on a day's notice without consulting his client

or another lawyer experienced in litigation, Brennan advised Davis that he would get back to

him.  (Pl.'s Opp'n, Brennan Dep., Ex. B at 260-64.)  Mercantile then also hired new outside

counsel, who advised Chicago Title that Mercantile was prepared to "cooperate fully" with

defendant's request for records, but needed "a clearer understanding" as to what Chicago Title

was looking for.  (Def.'s Summ. J. Mot., Ex. 71.)  Davis responded by asking for "an accounting

of the advances and repayments covered by each loan that Edward Kila guaranteed in his

capacity as trustee under the QPRTs and the basis on which interest has been calculated."  (*Id.*,

Ex. 72.)  Mercantile answered by filing suit on July 14, 2005.

At all times prior to May 2005, Chicago Title treated Mercantile's claim as covered

under the Commart and McShane title policies without regard to any policy defenses or relevant

reservations.  Chicago Title did not question whether a loss had occurred or seek to exercise its

rights under the terms of Policy Condition 5.  Thus, Chicago Title's previous behavior indicated

that the company would not insist on strict compliance with Policy Condition 5.  Consequently,

Chicago Title's claim under this provision is barred by application of waiver principles.[14]

### V. Attorneys Fees and Interest

In conclusion, Mercantile's summary judgment motion will be granted and Chicago Title's cross-motion will be denied. Mercantile is therefore entitled to $3.25 million with interest at the rate of six percent from June 9, 2005 to the present. *See Royal Ins. Co. of Am. v. Miles & Stockbridge, P.C.*, 138 F. Supp. 2d 695, 708-09 (D. Md. 2001); *Crystal v. West & Callahan, Inc.*, 614 A.2d 560, 572 (Md. 1992). Contrary to Mercantile's argument, however, it is not entitled to attorney fees. The Maryland rule allowing an insured to recover attorney fees in a declaratory judgment suit with his liability insurance company is an exception to the familiar "American rule," which requires each party to pay its respective legal fees. *See Collier v. MD.-Individual Practice Ass'n*, 607 A.2d 537, 543 (Md. 1992). The Court of Appeals has been unwilling to extend this exception to cases not involving liability insurers, *id*. at 544-45, and this court declines to do so here.

A separate order follows.

_____March 20, 2007_____                    _____/s/_____
Date                                        Catherine C. Blake
                                            United States District Judge

---

[14]    Even if not barred by waiver, Mercantile's alleged failure to satisfy Policy Condition 5 may be excused by Chicago Title's material breach of the Policies when it refused to cover Mercantile's loss.

25